IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

REBECCA J.,[1]
     Plaintiff,

          v.                      Civil No. 3:20-cv-00795 (DJN)

KILOLO KIJAKAZI,[2]
Commissioner of Social Security,
     Defendant.

**REPORT AND RECOMMENDATION**

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits under the Social Security Act (the "Act").

Plaintiff was forty-four years old at the time of her benefits application. (R. at 85.) She has a high school education and previously worked as a licensed nurse. (R. at 173, 182.) Plaintiff suffers from a perforated septum, asthma, and chronic laryngitis. (R. at 181.)

On January 10, 2020, an Administrative Law Judge ("ALJ") found Plaintiff not disabled under the Act. (R. at 22.) After exhausting her administrative remedies, Plaintiff now seeks review of the ALJ's decision, arguing that the ALJ's final decision is not supported by substantial evidence. (Pl.'s Mem. Supp. Mot. Summ. J. 7, 12 ECF No. 22 ("Pl.'s Mem.")).

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Acting Commissioner Kijakazi should be substituted as the defendant in this suit.

This matter comes before the Court pursuant to 28 U.S.C. § 636(c)(1) on cross motions for summary judgment, which are now ripe for review.[3] Having reviewed the parties' submissions and the entire record in this case, and for the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 21) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 23) be GRANTED; and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

On January 5, 2018, Plaintiff filed an application for disability insurance benefits alleging disability beginning January 6, 2016. (R. at 158.) The Social Security Administration ("SSA") initially denied this claim on April 12, 2018 (R. at 103) and again upon reconsideration on July 20, 2018. (R. at 109.) At Plaintiff's written request, the ALJ held a hearing on December 19, 2019, at which a vocational expert testified, as well as Plaintiff, who was represented by counsel. (R. at 31-55.) On January 10, 2020, the ALJ issued a written opinion holding that Plaintiff did not qualify as disabled under the Act. (R. at 15-22.) Plaintiff petitioned the SSA Appeals Council to review the decision, and on August 25, 2020, the Appeals Council denied her request for review, rendering the ALJ's decision as the final decision of the Commissioner. (R. at 1-3.) Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

---

[3] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does

3

not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting for the most the claimant can do despite her physical and mental limitations. § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. § 404.1520(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 2012 U.S. App. LEXIS 128, at *3 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. §§ 416.920(e), 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. § 404.1520(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 17-22.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from January 6, 2016 through December 31, 2019, the date on which she was last insured.[4] (R. at 17.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: (1) obesity; (2) Graves' disease; (3) asthma; and (4) perforated septum. (R. at 17.) At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.)

After step three, the ALJ determined Plaintiff's residual functional capacity.[5] (R. at 18.) The ALJ found that Plaintiff had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), with the exception that she can sit, stand, and walk six hours each

---

[4] Substantial gainful activity is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[5] Residual functional capacity is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the residual functional capacity, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

in an eight-hour workday. (R. at 18.) She can have occasional exposure to weather, dust, fumes, odors, and pulmonary irritants. (R. at 18.) Further, she would be off task seven percent of the workday. (R. at 18.)

At step four, the ALJ determined that Plaintiff could not perform her past relevant work as a vocational nurse, at least in the manner in which such work was actually or generally performed.[6] (R. at 20.) The conclusion was based on the ALJ's review of the record as well as the testimonies of Plaintiff and a vocational expert. (R. at 20-21.) At step five, the ALJ determined that Plaintiff could perform other work available in significant numbers in the national economy, such as usher/ticket taker, inspector, and coatroom attendant. (R. at 20-21.) Accordingly, the ALJ concluded that Plaintiff did not qualify as disabled under the Act. (R. at 21.)

## IV. ANALYSIS

Plaintiff argues that substantial evidence does not support the ALJ's evaluation of Plaintiff's residual functional capacity because the ALJ: (1) insufficiently accounted for the frequency and duration of Plaintiff's nasal treatment; and (2) improperly assessed Plaintiff's subjective complaints. (Pl.'s Mem at 10-15). Defendant responds that substantial evidence supports the ALJ's residual functional capacity assessment because the ALJ: (1) fully accounted for Plaintiff's credibly established limitations; and (2) properly evaluated Plaintiff's subjective complaints. (Def.'s Mot. Summ. J. ("Def.'s Mem.") at 10-18.

---

[6] Past relevant work is defined as substantial gainful activity in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

The Court concludes that the ALJ did not err in his evaluation of Plaintiff's residual functional capacity and that substantial evidence supports the final decision of the Commissioner.

**A. The ALJ Did Not Err When He Determined Plaintiff's Residual Functional Capacity.**

Plaintiff presents a number of arguments challenging the ALJ's determination of her residual functional capacity. First, she alleges that the ALJ's decision to deny her benefits is based on the ALJ's "complete misunderstanding" of the nasal irrigation and steaming course of treatment ("nasal treatment") Plaintiff must endure every day, which entirely precludes her from being able to work. (Pl.'s Mem. at 10-11).  In support, Plaintiff argues that since the ALJ determined, using objective evidence, an impairment which could reasonably produce the alleged symptoms, he had no basis for disbelieving Plaintiff's subjective complaints regarding the frequency and duration of her nasal treatment. (Pl.'s Mem. at 12-13).

Second, Plaintiff argues that the ALJ erroneously discredited her subjective complaints at step two of the *Craig* analysis by referencing her decision not to have surgery, and found, as a result, that her symptoms were not as limiting as she claimed. (Pl.'s Mem. at 13).

The regulations require the ALJ to follow a two-step analysis when considering a claimant's subjective statements regarding her impairments and symptoms. *Lewis v. Berryhill*, 858 F.3d 858, 866 (2017); *see* § 404.1529(b)-(c). The ALJ must first determine whether objective medical evidence shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. 20 C.F.R. § 404.1529(a)-

(b); *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996).[7] If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. SSR 16-3p, 2016 SSR LEXIS 4, 2016 WL 1119029, at *4 (Mar. 16, 2016); *see also Craig*, 76 F.3d at 595. If the objective medical evidence does not support the claimant's statements, then the ALJ must make a finding on credibility when considering the entire case record. Social Security Ruling (SSR) 96-7p, 1996 SSR LEXIS 4, 1996 WL 374186, at *2 (July 2, 1996).

The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591. However, the ALJ cannot reject the claimant's subjective description of her pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c)(2). Nonetheless, a claimant's allegations of pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." *Craig*, 76 F.3d at 595.

The ALJ must consider all the evidence in the record, including the claimant's other statements, her daily activities, her treatment history, any medical-source statements, and the

---

[7] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. § 404.1529(c)(2), and includes observable signs and laboratory findings. *Id*. § 404.1502(f). "Symptoms" are the claimant's description of his or her impairment. *Id*. § 404.1502(i).

objective medical evidence, *id.* (citing 20 C.F.R. § 404.1529(c)), and must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements. *See Eggleston v. Colvin*, No. 4:12cv43, 2013 U.S. Dist. LEXIS 135573, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013). In other words, the ALJ must "build an accurate and logical bridge from the evidence to his conclusion." *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 269 (4th Cir. 2017) (citations omitted).

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

### 1. Plaintiff's Nasal Treatment and Her Ability to Work.

First, Plaintiff argues that there is not substantial evidence in the record to support the ALJ's residual functional capacity findings because the frequency and duration required to complete her nasal treatment preclude Plaintiff from performing any work-related activities. (Pl.'s Mem. at 11). As part of this challenge, Plaintiff argues that the ALJ did not have a proper basis for finding that her subjective descriptions of her symptoms were not fully credible. (Pl.'s Mem. at 15). In doing so, Plaintiff contends that the ALJ did not fully appreciate the extent to which her nasal treatment totally precludes her from performing any work-related activities when the ALJ

determined Plaintiff's residual functional capacity. (Pl.'s Mem. at 15). Plaintiff challenges the ALJ's residual functional capacity determination by arguing that she is incapable of sustaining work activity consistently "without loss of more than 15 percent productivity in any given day and that she would miss more than one day per month due to her treatment regimen." (Pl.'s Mem. at 18). Plaintiff further contends that such limitations preclude her from all work. (Pl.'s Mem. at 18, citing to the vocational expert's testimony at R. 53-54).

Defendant responds that substantial evidence supports the ALJ's residual functional capacity assessment, "which fully accounted for Plaintiff's credibly-established limitations." (Def.'s Mem. at 10). Defendant explains that because Plaintiff's allegations are not supported by the record, she failed to meet her burden that the frequency of her nasal treatment prevents her from maintaining a regular work schedule. (Def.'s Mem. at 13).

*a. Plaintiff's Relevant Medical History.*

Plaintiff reported daily post-nasal drip and nasal congestion in August 2017, when a physical examination showed the presence of edematous mucosa, but otherwise normal findings. (R. at 290.) Her doctor ordered a spirometry study, which came back with normal results, and he instructed her to use Flonase. (R. at 287-88, 291-92.) She treated with an Ear, Nose and Throat ("ENT") specialist in September 2017, who determined, based on a fiberoptic laryngoscopy, that Plaintiff had a "sizeable septal perforation" in her nasal cavity. (R. at 536.) He recommended saline irrigations and saline spray to prevent crust build-up. (R. at 537.) On January 16, 2018, Plaintiff followed up with her primary care physician and complained of a headache, itchy eyes, facial pain, facial pressure, sleep difficulties, post-nasal drip, sneezing, and laryngitis, which she reported "developed suddenly." (R. at 281.) Plaintiff told her doctor that she had shortness of breath,

10

although her oxygen saturation level was ninety-nine percent. (R. at 281.) Her doctor noted that he could not find "any significant pathology" and referred her to the emergency room due to her concerns. (R. at 281.) Three days later, Plaintiff presented to an ENT specialist complaining of a history of nasal crusting, dryness, occasional bleeding, thick postnasal drip, and frequent production of phlegm. (R. at 542.) She was referred for a CT scan and to Dr. Theodore A. Schuman ("Dr. Schuman"), another ENT specialist, for a second opinion. (R. at 540-41.)

Plaintiff treated with Dr. Schuman on April 23, 2018, reporting that she "[r]inses frequently, [but] does not use steroid spray." (R. at 432.) Upon examination, Dr. Schuman determined that Plaintiff had a large perforation in the septum, and small, lateralized middle turbinates with edematous, dry, mucosa and scarring in middle meatus. (R. at 433.) He assigned her a regimen of antibiotics and steroid medication sinus rinses and told her to return in six to eight weeks to evaluate her condition. (R. at 434.) When Plaintiff returned to Dr. Schuman on June 6, 2018, she "has been doing well since her last visit." (R. at 381.) Upon examination, she was found to have a "[c]lean septal perforation without crusting." (R. at 383.) She reported having to "steam her nose after using rinses to remove[] "plugs" of mucus." (R. at 381.) She also relayed that she "tried using medicated rinses for 2-3 days but stopped because she noticed no relief and states that they dried her nasal cavity." (R. at 381.) Instead, Plaintiff told her doctor that she uses saline irrigations with baby shampoo two to three times daily and was counseled on irrigating with high volume saline at least once daily using distilled or previously boiled water rather than tap water. (R. at 386.) Additionally, she was prescribed saline nasal spray to be applied four times daily. (R.

at 383.) On June 13, 2018, Plaintiff's biopsy results came back "essentially normal," and she was instructed to continue her rinses. (R. at 600.)

Plaintiff visited her rheumatologist on August 7, 2018, who noted that she continued to experience "nasal dryness and hoarse voice that requires [sic] very frequent treatment with nasal saline sprays and steam inhalation . . . ." (R. at 484.) She reported that her symptoms "interfere[] with work due to need for very frequent treatment with nasal saline sprays and steam inhalation." (R. at 486.) Plaintiff was again prescribed an irrigation solution, with instructions to administer it twice daily, and saline nasal spray, to be sprayed twice in each nostril four times daily. (R. at 612.)

### b. Plaintiff's Hearing Testimony.

Plaintiff testified that she is unable to work because of the time she requires to irrigate her nasal passage and clear blockage through "steaming." (R. at 36, 40-42.) She testified that she has "to steam" when she wakes up, and irrigate "using baby soap, liquid soap . . . [and] saline solution mixed with distilled water." (R. at 40-41.) While the irrigation only takes ten minutes and can only be done "up to three times a day," Plaintiff needs to use steam to "unblock" the mucus in her nose, which can sometimes take hours until she feels relief. (R. at 40-41.) She testified that she steams three times a day, but on days when she feels "extremely stuffed up, like blocked, it can be every two hours until it unblocks." (R. at 40.) According to Plaintiff, those types of days happen "at least once a week" or "every four to five days" over the last two or three years. (R. at 40, 42.)

Plaintiff testified that her nasal treatment interferes with certain activities of daily living, such as grocery shopping, because she must steam, sometimes for hours, in order clear her sinuses before leaving the house. (R. at 45.) When asked if she has to "re-steam" after going to a doctor's appointment, Plaintiff replied "Before and then after. As soon as I get home, I have to have that

12

and I usually call my mom and say can you have the water ready?" (R. at 45.) Plaintiff further explained, "the only way to get rid of [the nasal fluid] is I have to steam and I have to do that at least three times a day and every time it takes an hour and a half to two hours of breathing that steam in to just loosen it up so I can cough that up. It's exhausting to go through this." (R. at 36.)

Plaintiff noted that the "environment is a big thing" that affects her symptoms and impacts her nasal treatment. (R. at 38-39.) She testified that she moved to Virginia in September 2015, but became sick in December 2015, presumably from pollen and other environmental allergens. (R. at 35, 39.) Plaintiff "has a humidifier running all the time," but also testified that the humid summer in Virginia makes her symptoms worse. (R. at 37-38.) In clarifying, she told the ALJ that "it has to be like, that cool –cool air hitting me . . . it helps to add moisture. If it's too hot, too dried out, then I dry out even more." (R. at 38.) Plaintiff noted that she needs to control the amount of moisture around her by keeping it "around 45%," in her environment, prefers the temperature in her house to stay at sixty-eight degrees, but worries that any moisture beyond sixty percent may cause a "buildup of bacteria." (R. at 38.) According to Plaintiff, "everything affects me. Like I said, the heat or cold, perfumes . . . cigarette smoke." (R. at 43.) She explained that exposure to these elements will cause problems with her sinuses, which either impedes her from going out or causes her to take additional steps to prepare for potential problems before going out. (R. at 45.)

Finally, when asked if there was "any job" she could do, Plaintiff replied "I don't know how I would get through the day . . . I'm so dried out that it's hard. It's so emotionally hard on me." (R. at 37.)

13

### c. The Vocational Expert's Testimony.

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and residual functional capacity, the claimant could perform other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 404.1566, 416.920(g), 416.966. The Commissioner can address the final step with the use of testimony of a vocational expert. §§ 404.1566(e), 416.966(e). During an administrative hearing, the ALJ must pose hypothetical questions to the vocational expert that accurately represent the claimant's residual functional capacity, so that the vocational expert can offer testimony about any jobs existing in the national economy that the claimant could perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the vocational expert be "relevant or helpful." *Id*.

During Plaintiff's hearing, the ALJ posed a series of hypothetical questions to the vocational expert, who listened to Plaintiff's testimony. (R. at 49-54.) Of these hypotheticals, the vocational expert confirmed that an individual with Plaintiff's age, education, and work experience could perform work at the medium level, with the following limitations: sitting, standing, and walking for six hours each; "occasional exposure to weather, occasional exposure to dust, odors, fumes, and pulmonary irritants, and off-task 7% of the time in a normal workday." (R. at 52.) The vocational expert testified that an individual with this residual functional capacity could perform the representative occupations of usher/ticket taker, inspector, and coatroom attendant. (R. at 52-53.)

14

*d. The ALJ's Findings.*

In accordance with the regulations and the two-step *Craig* analysis, the ALJ determined that Plaintiff's asthma and septum perforation were severe, medically-determinable impairments based on the objective medical evidence.[8] (R. at 17, 19.) The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms"[9] but that Plaintiff's statements concerning the intensity, persistence and limiting effects were not entirely consistent with both the medical evidence and other evidence within the record. (R. at 19.)

Here, the ALJ gave valid reasons for finding that Plaintiff's descriptions of her symptoms and symptom management were at odds with the evidence of record. When making his credibility determination, the ALJ evaluated Plaintiff's allegations that her impairments "prevent her from working [due to] fatigue and [needing] to frequently steam her throat due to excess mucous." (R. at 19.) The ALJ found that the objective evidence does not fully support her statements. (R. at 19.) The ALJ noted that Plaintiff underwent both a nasopharyngoscopy and nasal endoscopy, which showed no significant pathology other than the perforation. (R. at 19, citing R. at 529-45, 368-374.) A CT scan of Plaintiff's neck revealed "a large septal perforation, atrophic turbinates and mild bilateral ethmoid and max mucosal changes. (R. at 19, 432.)

The ALJ also found that Plaintiff treated conservatively when managing her symptoms, mainly by taking oral medications. (R. at 19.) Plaintiff was prescribed medication to complete her

---

[8] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. § 404.1529(c)(2), and includes observable signs and laboratory findings. *Id.* § 404.1502(f).
[9] "Symptoms" are the claimant's description of his or her impairment. 20 C.F.R § 404.1502(i).

nasal treatment at home, but with specific instructions to irrigate up to three times daily and to use nasal spray twice in each nostril four times daily. (R. at 612.) While her doctors instructed her to irrigate using the saline solution and distilled or previously boiled tap water, Plaintiff conceded using baby shampoo and baby soap in her regimen. (R. at 40, 386.)

The ALJ also noted that Plaintiff's abilities to perform activities of daily living showed that her symptoms were not as limiting as she claimed. (R. at 19-20, 194.) For instance, Plaintiff demonstrated that she could care for her personal needs, prepare meals, drive, read, watch television, do laundry, vacuum, and grocery shop. (R. at 19, 194-199.) Plaintiff also reported to her medical providers that she "experienced nighttime cough", but nonetheless denied "limitation in activity." (R. at 291.)

 Plaintiff argues that the ALJ's consideration of her daily activities is "wholly insufficient to support denial of the claim," and must not take into account the "type of activities [she] can perform without also considering the extent to which she can perform them." (Pl.'s Mem. at 16). However, this argument is misplaced. The ALJ considered Plaintiff's activities of daily living  for purposes of the credibility determination, and not as examples of the functions [Plaintiff] could perform in a single day. *See Ladda v. Berryhill*, 749 App'x 166, 173 n.4 (4th Cir. 2018) (claimant asserted that the ALJ erred in assessing his daily activities as evidence of his ability to work for an entire day, however, the ALJ cited claimant's daily activities for purposes of the credibility determination and not as examples of the functions he could perform for an entire day).

Similarly, the ALJ did not selectively "cherry-pick" those portions of evidence which "suit him," as Plaintiff suggests, but satisfied his duty in considering any conflicts between Plaintiff's statements and the rest of the evidence. (Pl.'s Mem. at 16); *see also* 20 C.F.R. § 404.1529(c). To

16

the extent that Plaintiff's statements about her limitations were inconsistent with the objective medical findings, the ALJ did not need to accept them. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curium) (finding no error when "the ALJ cited specific contradictory testimony and evidence in analyzing Bishop's credibility"); *see also Craig*, 76 F.3d at 595. Likewise, it was permissible for the ALJ to find that Plaintiff's allegations regarding the duration and frequency of her nasal irrigation regimen were undermined by her own statements to providers that her activities were not limited, the objective evidence in the record, and her choice to treat conservatively, namely by using oral medications. (R. at 19-20.) *See* 20 C.F.R. § 404.1529(c)(3)(iv)-(v) (noting that the ALJ may consider the nature of a claimant's treatment in evaluating the severity of her symptoms).

There is no opinion in the record suggesting greater limitations than those accounted for in the ALJ's residual functional capacity determination. Plaintiff contends, without pointing to evidence in the record, that she does not have the ability "to consistently sustain work activity without loss of more than 15 percent productivity in any given day and that she would miss more than one day per month due to her treatment regimen." (Pl.'s Mem. at 18). Yet, as Defendant correctly points out, "[t]he ALJ need only include credibly-established limitations in the [residual functional capacity]." (Def.'s Mem. at 13). The record is devoid of sufficient evidence, including opinions and treatment notes, demonstrating that Plaintiff would be off task more than seven percent of the day to account for her nasal treatment.

Instead, the ALJ formulated the residual functional capacity based on the objective medical evidence and, to the extent it was consistent with the other evidence of record, Plaintiff's subjective description of her symptoms, namely, the management of her septum perforation through routine

17

rinses. Therefore, the Court finds that the ALJ did not err in considering the extent of Plaintiff's

nasal treatment, and substantial evidence supports his residual functional capacity findings.

> 2. *Plaintiff's Refusal to Engage in Surgery and the Impact on her Credibility.*

Plaintiff specifically objects to the ALJ's determination that she refused surgery, arguing

that surgery was "never offered" to Plaintiff, and therefore should not have been considered by the

ALJ when determining the extent or severity of Plaintiff's allegations. (Pl.'s Mem. at 14). It is

not clear why Plaintiff makes such an assertion, however, as Plaintiff's attorney stated during

the hearing that "there is a surgery [Plaintiff] can try to do with a doctor out in California . . .

which will close this perforated septum and hopefully alleviate her of all the problems she's

going to describe today." (R. at 34.) Consistent with this representation is a medical billing

record showing that on July 19, 2018, Plaintiff sought and received a quote for the cost of

surgery. (R. at 571.) Further, Plaintiff's attorney represented at her hearing that:

> She needs an operation and it's an operation that she has been told
> now by several ENT doctors, there are a handful in the country that
> may be capable of doing it but she doesn't have the money to do it.
> She's not here for the disability benefits. She's here for the
> Medicare.

(R. at 33.) In addition to this evidence, it is clear from the record that Plaintiff's providers advised

her on surgery and that she considered the option but refused due to financial and/or "logistical"

reasons. (R. at 432 ("Has known large septal perforation and has discussed repair in past – very

interested in seeing surgeon in LA but this is not feasible from a logistics standpoint.").) Indeed,

Plaintiff testified "all I want is that surgery so I can get back to work," but noted that "without the right insurance, you can't have it done and I don't have $20,000 to have it done." (R. at 39.)

An ALJ can consider a lack of medical treatment as a factor in disability determinations. 20 C.F.R. §§ 404.1529(c)(3)(iii)(vii); *see also* 20 C.F.R. § 404.1530. Indeed, the Fourth Circuit has recognized that the inconsistency between allegations and treatment sought is probative. *See Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994). However, the ALJ must not draw any inferences about an individual's failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide. *See* § 404.1530. As a matter of law, in order for benefits to be denied based on noncompliance, in full or in part, the Commissioner must conduct a particularized inquiry and develop a record establishing by substantial evidence that the claimant's impairment is reasonably remediable by the claimant given the claimant's particular situation and that the claimant lacks good cause for failing to follow a prescribed treatment program. *See Preston v. Heckler*, 769 F.2d 988, 990 (4th Cir. 1985) (finding that the ALJ committed legal error by denying Plaintiff benefits for failure to comply with her treatment program without reconciling whether Plaintiff had good cause); *Fleming v. Barnhart*, 284 F. Supp. 2d 256, 274 (D. Md. 2003) (reversing the ALJ's decision to deny benefits on the basis of Plaintiff's failure to obtain the recommended therapy because the ALJ "inappropriately assumed both that plaintiff's impairments were reasonably remediable . . . and that plaintiff lacked good cause for the alleged noncompliance.")

In this case, the ALJ evaluated Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms as part of his *Craig* analysis. (R. at 19-20.) He found that the evidence does not support her allegation that she cannot complete routine daily tasks because she

19

was able to care for her personal needs, prepare meals, drive, read, watch television, do laundry, vacuum, and grocery shop. (R. at 19.) He noted that although her asthma was found to be exacerbated by acute illness or allergies, the objective evidence otherwise did not reveal abnormalities consistently, and her oxygen saturation, voice, gait, strength, and range of motion were all found to be normal upon examination. (R. at 19.)

The ALJ noted that "although offered surgery to correct her perforated septum, the claimant denied." (R. at 19.) He then pointed to Plaintiff's demonstrated ability to perform activities of daily living, such as caring for her personal needs, preparing meals, driving, reading, watching television, doing laundry, vacuuming, and grocery shopping. (R. at 19.) He concluded that "[a]lthough claimant does experience some symptoms because of her physical impairments, the objective findings in the record, the conservative care the claimant received, and her admitted ability to perform a variety of daily tasks all suggest that these symptoms are not as limiting as she claims." (R. at 19-20.)

It is clear from this analysis that Plaintiff's choice in not following through with surgery was not the sole reason why the ALJ discounted her credibility. *See Ketterman v. Colvin*, No. 2:15cv18, 2016 U.S. Dist. LEXIS 11431, *13 (N.D.W. Va. Jan. 12, 2016) (finding that the ALJ's decision to discredit claimant for not electing to undergo surgery was not in error because this was not the sole reason why the ALJ discounted the claimant's credibility) (Report and Recommendation adopted by United States District Judge John P. Bailey on February 1, 2016 2016 U.S. Dist. LEXIS 12312 (N.D.W. Va. Jan. 12, 2016)). Although the ALJ found that Plaintiff's decision to treat conservatively contributed to his step-two findings, he did not deny Plaintiff disability benefits based *solely* on any alleged noncompliance or failure to follow a

20

prescribed treatment plan. (R. at 19-20.) As Defendant correctly notes, "the ALJ never stated that Plaintiff was less credible because she declined to get surgery." (Def.'s Mem. at 17).

Because the ALJ factored in other evidence, besides the choice not to undergo surgery, when determining Plaintiff's credibility, the undersigned finds that substantial evidence supports the ALJ's analysis here.

## V. CONCLUSION

For the reasons set forth above, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 21) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 23) be GRANTED and the final decision of the Commissioner be AFFIRMED.

Let the Clerk file a copy of this Report and Recommendation electronically, notify all counsel of record and forward a copy to United States District Judge David J. Novak.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/ MRC

Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: February 10, 2022

21